AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

## for the
### District of Oregon

FILED 13 NOV '17 15:33USDC-ORP

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

624 NE 2nd St; Unit #B168, 2600 NE Lafayette Ave.;
Unit #2020 and Unit #G148,1500 NE Lafayette Ave., all
of McMinnville, OR 97128

)
)
)
)
)
)

Case No.    '17-MC-588 A-C

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
624 NE 2nd Street, McMinnville, OR 97128; Unit #B168, 2600 NE Lafayette Ave., McMinnville, OR 97128; Units #2020/ #G148,1500 NE Lafayette Ave., McMinnville, OR 97128 more particularly described in Attachment A, attached hereto.

located in the _____ District of _____ Oregon _____ , there is now concealed *(identify the person or describe the property to be seized):*
The information and items set forth in Attachment B hereto.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18/1343; 15/78j(b); 18/152(2); 26/7201 | Wire Fraud; Manipulative and Deceptive Devices; Bankruptcy Fraud; Tax Evasion |

The application is based on these facts:
See affidavit which is attached hereto and incorporated herein by this reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jason Nix, Special Agent, IRS-CI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  11/13/17

_____
*Judge's signature*

City and state:  Portland, Oregon

Paul J. Papak, United States Magistrate Judge
*Printed name and title*

STATE OF OREGON     )
                            )       AFFIDAVIT OF Jason Nix

County of Multnomah)

### Affidavit in Support of an Application
### Under Rule 41 for a Search Warrant

I, Jason Nix, being duly sworn, do hereby depose and state as follows:

## SECTION I
## INTRODUCTION and AGENT BACKGROUND

### Introduction

1.      The United States is investigating potential violations of wire fraud, 18 U.S.C. § 1343, manipulative and deceptive devices (investment account churning), 15 U.S.C. § 78j(b), bankruptcy fraud, 18 U.S.C. § 152(2), and evasion of payment of tax, 26 U.S.C. § 7201, committed by James W. Millegan (Millegan) and his firm, J.W. Millegan, Inc. (JWMI). More specifically, the allegations being investigated include whether Millegan defrauded his clients through excessive trades to generate commissions (known as churning), whether he made false statements in relation to his Chapter 7 bankruptcy filed in January 2017, and if he evaded the payment of his personal tax liability when he put assets out of the reach of the Internal Revenue Service in order to defeat efforts to collect the tax due.

2.      Millegan was first registered with the Financial Industry Regulatory Authority (FINRA) as a securities broker in 1983 and worked at Lehman Brothers, Inc. and Ragen Mackenzie, Inc. before registering his own firm, JWMI, in 1996. According to FINRA's online database of registered brokers, Millegan is an experienced broker with a long career in the securities industry. He has been registered as a broker in eight U.S. states, including Alaska, Arizona, California, Colorado, Massachusetts, Ohio, Oregon, and Washington and has passed

two principal/supervisory exams, two general industry/product exams, and two state securities law exams. Millegan is currently listed with FINRA as previously registered which indicates that he is not currently licensed to act as a broker or as an investment adviser, but may still be able to offer other investment-related services if properly licensed to do so.

3.      Oregon Division of Financial Regulation (ODFR) determined that JWMI typically had about 86 households as clients but that in October 2015, 27 JWMI clients had left the firm for other brokers. The JWMI clients who left were, on average, over age 60 and had a conservative or moderate risk tolerance with an objective of growth. ODFR found that Millegan's average trade volume for a 44 month period between January 2012 and October 2015 was 931 trades per month in stocks that were often more volatile than his clients risk tolerance. The trades that Millegan conducted generated what appear to be excessive fees for himself.

4.      In approximately June 2016, an evidentiary hearing regarding a FINRA Arbitration claim against Millegan and his broker-dealer company was held and multiple witnesses testified, including experts and investors/claimants. In September 2016, the arbitration panel determined that the claimants had established the elements of churning and they were awarded damages, as well as various fees and costs. As a result of the determination, JWMI closed.

5.      Some of JWMI's clients were referred to other brokers while other clients had their accounts moved to Woodworth Contrarian Stock and Bond Fund (Woodworth Contrarian), a hedge fund which is supposedly run by Millegan's currently 22 year old son, Drew Millegan. Although Millegan is no longer a licensed broker, he testified in a bankruptcy hearing that he

advises Drew Millegan about Woodworth Contrarian clients and has met with Woodworth Contrarian clients.

6.      In August 2016, the United States Attorney's Office for the District of Oregon received a referral from ODFR concerning information that Millegan, in his capacity as a broker-dealer for his firm JWMI, had engaged in churning.

7.      In 2001 the IRS began collection proceedings against Millegan for his outstanding personal income tax liability. According to IRS records, between January 2001 and February 2008 Millegan paid $1,376,312.94, earned as commissions from JWMI, in payments to the IRS for his outstanding tax liability from past years. However, Millegan still had outstanding taxes from current years. In order to make a payment on those outstanding taxes, in October 2007, Millegan agreed to sell his 1938 Rolls Royce Phantom valued at more than $900,000. When the vehicle sold in July 2008, Millegan told the IRS Revenue Officer that he had sent $125,000 in proceeds to the IRS via check. When the check did not arrive for three weeks, the Revenue Officer levied Millegan's bank account and obtained $125,012.97. After the levy was paid, Millegan stopped making payments to the IRS and took steps to evade the payment of his personal income tax during the remainder of the collections efforts by the IRS. During 2015, IRS Criminal Investigation began investigating allegations that Millegan was evading the payment of his personal tax liability by making false statements to the IRS, and by using business bank accounts to transfer his income out of the reach of the IRS.

8.      On January 5, 2017, Millegan and his wife, Debra Millegan, filed for Chapter 7 bankruptcy in United States Bankruptcy Court for the District of Oregon. At a bankruptcy

meeting of creditors, Millegan testified falsely about Woodworth Contrarian, admitted to keeping funds out of the reach of the IRS, and made other false statements under oath.

## Special Agent Background

9.      I have been a Special Agent with the Internal Revenue Service-Criminal Investigation since March 31, 2005 and I am currently assigned to the Portland, Oregon post of duty.  In the course of this employment, I have conducted or been involved in numerous investigations of alleged criminal violations, which have included: income tax evasion, false income tax returns, aiding or assisting in filing false returns or fraudulent statements, identity theft, money laundering, structuring cash transactions, and wire fraud. These investigations focused on individuals deriving income from legal and illegal sources.

10.     My duties as a Special Agent are to investigate potential violations of the Internal Revenue Code (IRC), codified in Title 26, and various sections of Title 18 and Title 31, United States Code. I have participated in the execution of numerous search and arrest warrants, witness interviews, surveillances, undercover operations, as well as other investigative techniques.

11.     I have attended multiple trainings in various aspects of criminal investigation as well as attending and instructing classes and seminars dealing specifically with money laundering, various financial investigative techniques and related financial investigations. I have attended six months of training at the Federal Law Enforcement Training Center in Glynco, Georgia where I studied criminal law, financial crimes, tax law and the execution of search warrants.  I attend continuing education on a yearly basis and receive updates on current criminal tax law and investigative techniques

Page 4 – Affidavit of Jason Nix

12.     From my experience, I know that persons who are involved in criminal activities, such as income tax evasion, frequently structure their financial activities in such a manner as to hide income and assets and disguise the ownership of income and assets.  Some, but not all, of the means used are:

    a.    forming multiple corporate entities with nominee ownerships to hide the true ownership of business activities,

    b.    using of multiple aliases,

    c.    placing bank accounts in nominee names to disguise the ownership of the income and the asset,

    d.    placing assets in nominees, trusts and corporations they control, or using aliases to purchase assets to conceal the true ownership,

    e.    using currency, money orders and cashier's checks for the payment of living expenses, debts and purchases of assets,

    f.    dealing in large amounts of cash,

    g.    attempting to avoid Currency Transaction Reporting requirements

13.     From my background and experience, I know that individuals involved in a business or income producing activity will keep some, or all, of the following types of records:  account ledgers, logs of income and expenses, sales invoices, expense invoices, purchase invoices, bank account statements, cancelled checks, check registers, asset purchase records, loan and liability records, balance sheets, diaries of business activities, calendars, correspondence, notes and memorandums, phone records, payroll and employment records and ledgers and journals summarizing business income and expenses. Individuals involved in a business also often have

Page 5 – Affidavit of Jason Nix

record retention requirements from government regulatory agencies. The primary Federal agencies

that regulate the stock industry include The Securities and Exchange Commission (SEC) and

Financial Industry Regulatory Authority (FINRA). The record retention requirements for stock

brokers is found in Title 17 §240.17a-4 which requires brokers and dealers to preserve all their

records for a period of not less than 6 years.

14.     I also know that individuals normally maintain records of their personal financial

activity, such as receipts for expenditures by cash or by check, bank records, and other financial

documents. From my experience, I know that these records are often maintained in hard-copy form

and on personal computers or electronic storage devices at businesses, personal residences, safe

deposit boxes or other storage facilities. These records are often provided in whole or in part to

bookkeepers, return preparers, and CPAs. This interaction with these representatives also usually

produces correspondence by mail, email, and text.

15.     I know that persons engaged in criminal activities, such as income tax evasion,

often maintain such records for long periods of time, particularly when they are involved in

ongoing criminal conduct over a long period of time. The evidence may be innocuous at first

glance (e.g. financial, credit card and banking documents, travel documents, receipts, documents

reflecting purchases of assets, personal calendars, etc.), but have significance and relevance

when considered in light of other evidence.  The criminal offender may no longer realize he/she

still possesses the evidence or may believe law enforcement could not obtain a search warrant to

seize the evidence. I have learned from conducting income tax investigations that it is often

necessary to secure records kept by these persons in order to accurately determine federal income

tax filing requirements and to reconstruct total income, adjusted gross income and taxable

Page 6 – Affidavit of Jason Nix

income. Often, without seizing the records maintained by the persons, it is likely that not all assets and taxable income sources will be discovered.

16.    Based on my experience I know individuals who are involved in financial crimes and tax evasion will often keep their financial records at locations they feel are the most private and secure. Often, this location is their personal residence, their vehicles and in bags under their control such as briefcases, and personal computers or other electronic storage devices. I also know that these individuals will go to great measures to hide the location of their residence and other assets to evade the payment of income taxes.

17.    Evidence of a defendant's expenditures, asset accumulation, and financial life-style is often necessary to reconstruct income, expenses, taxable income and federal income tax. The source and application of funds analysis focuses on a suspect's sources of funds and expenditures during the time period of the purported failure to file tax returns. This analysis requires evaluation of bank records, credit records, loan records, documents evidencing ownership of assets, and other documents evidencing the financial profile of the suspect during the course of the purported tax crimes.

18.    Elements of tax crimes may be proven through direct and indirect methods which may require establishing a starting point or baseline to evaluate changes in net worth. Financial information necessary to establish a starting point must be obtained and evaluated for several years prior to the first year under investigation. Based on my training and experience, I believe evidence from January 1, 2009, to present is relevant to the criminal tax crimes and fraud crimes Millegan has allegedly committed.

Page 7 – Affidavit of Jason Nix

19.     The information contained herein is based upon my conversations with law enforcement agents and others, my review of documents, and my personal experience and knowledge. Where I report statements made by others, those statements are reported in substance and not verbatim. Because this Affidavit is being submitted for the limited purpose of establishing probable cause to obtain a search warrant, it does not include all of the facts that I have learned during the course of this investigation.

## Locations to be Searched

20.     I believe there is probable cause that Millegan has committed federal offenses to include Wire Fraud, Manipulative and Deceptive Devices (investment account churning), Bankruptcy Fraud, and the Evasion of Payment of his personal income tax. As set forth in this affidavit, I believe there is probable cause that financial business records necessary to prove his fraudulent investment activity, false bankruptcy statements, and affirmative acts of evasion of payment as set forth in Attachment B are being maintained and stored and will be found in:

1.     Millegan's residence/office of Woodworth Contrarian – 624 NE 2nd Street, McMinnville, OR 97128[1]

2.     McMinnville Self Stor - 2600 NE Lafayette Avenue, Unit #B168, McMinnville, OR 97128

---

[1] This location is also the primary business location for Woodworth Contrarian Stock and Bond Fund which is rented by Millegan's son, Drew Millegan. Millegan is a consultant for the business and the clients are former clients of JW Millegan Inc. which is Millegan's defunct investment firm. On the Oregon State corporate filings Drew Millegan listed 624 NE 2nd Street, McMinnville, OR 97128 as his home address and has listed the same home address on other corporate filings with the State of Oregon. A second home address the Drew Millegan listed is PO Box 1610, McMinnville, OR 97128 which was also listed for his brother, Quinn Millegan. Drew Millegan also listed 624 NE 2nd Street, McMinnville, OR 97128 as his address on corporate filings with the SEC.

Page 8 – Affidavit of Jason Nix

3.   Your Public Storage - 1500 Lafayette Avenue, Units #2020 and #G148, McMinnville, OR 97128

Therefore, I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the above locations.

## SECTION II
## APPLICABLE STATUTES
### Wire Fraud

21.      Title 18, U.S.C. § 1343, Fraud by Wire, Radio, or Television, states in pertinent part that "Whoever, having devised or intending to devise any scheme or artifice to defraud, or by obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

### Manipulative and Deceptive Devices (investment account churning)

22.      Title 15, U.S.C. § 78j(b), Manipulative and Deceptive Devices, states in pertinent part that "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance . . . ." Any person who willfully violates § 78j(b) "shall upon conviction be fined not more than $5,000,000, or imprisoned not more than 20

Page 9 – Affidavit of Jason Nix

years, or both . . . but no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation." According to 17 CFR 240.15c1-7, the term "manipulative, deceptive, or other fraudulent device or contrivance," has been defined by the Securities and Exchange Commission (SEC) to include "any act of any broker, dealer or municipal securities dealer designed to effect with or for any customer's account in respect to which such broker, dealer or municipal securities dealer or his agent or employee is vested with any discretionary power any transactions or purchase or sale which are excessive in size or frequency in view of the financial resources and character of such account." Such transactions include churning.

### False Statement Under Oath in Bankruptcy Proceeding

23.    Title 18, U.S.C. § 152(2), False Statement Under Oath, states: in pertinent part that any person who "knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11 . . . shall be fined under this title, imprisoned not more than 5 years, or both."

### Tax Evasion

24.    Title 26, U.S.C. § 7201, Attempt to Evade or Defeat Tax, states in pertinent part that "[a]ny person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall . . . be guilty of a felony and . . . shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution."

Page 10 – Affidavit of Jason Nix

## SECTION III

## FACTS ESTABLISHNG PROBABLE CAUSE

### Excessive Trading or "Churning"

25.     Millegan was first registered with the FINRA as a securities broker in 1983 and registered his own firm, JWMI, in 1996. FINRA's online database of registered brokers shows that Millegan has a long career in the securities industry, has been registered as a broker in multiple states including Oregon, and has passed multiple securities exams. Millegan is currently listed with FINRA as previously registered which indicates that he is not currently licensed to act as a broker or as an investment adviser, but may still be able to offer other investment-related services if properly licensed to do so.

26.     In approximately June 2016, an evidentiary hearing regarding a FINRA Arbitration claim against Millegan and his broker-dealer company was held. According to ODFR, multiple witnesses testified, including Millegan, experts, and investors/claimants. The final FINRA Arbitration Panel (Panel) finding was that "all of these accounts were excessively traded in light of these Claimants' investment objectives/risk tolerances . . ." The Panel also found that "Millegan acted with willful and reckless disregard for the interests of Claimants . . . the elements of churning are met" As a result of the Panel finding, the claimants were awarded damages, as well as various fees and costs.

Page 11 – Affidavit of Jason Nix

27.    As a result of the FINRA arbitration hearing, JWMI was closed and some of Millegan's clients were referred to other brokers. A large number of clients were transferred to the Woodworth Contrarian Stock and Bond Fund (Woodworth Contrarian), a hedge fund, which is run by Millegan's currently 22 year old son, Drew Millegan. Although Millegan is no longer a licensed broker, he continues to advise Drew Millegan about his clients and has met with Woodworth Contrarian clients.

28.    In January of 2016, ODFR issued a final order to Millegan to cease and desist as part of a negotiated settlement of Millegan's alleged wrongdoings. ODFR also ruled that Millegan had failed to meet a requirement to keep his license updated by failing to disclose the filing of tax liens against him. In August 2016, the United States Attorney's Office for the District of Oregon received a referral from ODFR concerning information that Millegan had engaged in churning in his capacity as a broker-dealer for his firm JWMI.

29.    After researching information posted on websites for the SEC, FINRA, and securities industry attorneys and experts, I determined that excessive trading (churning) occurs when a broker engages in disproportionate buying and selling of securities in a customer's account in order to generate commissions for his own benefit. For clients to prove that churning has occurred on their account, three elements must be present in the trading activity. 1) The broker has either expressed or implied control of the client account. Expressed control would be the result of an agreement in writing, while implied control would be through client preference to broker account management due to client inexperience or client trust of the broker. In either case, the client has accepted the broker's decisions. When broker control of the account is implied, clients have to demonstrate that they lack sophistication in financial matters, have a relatively

Page 12 – Affidavit of Jason Nix

small amount of experience in securities, did not do research on their own, and consistently demonstrated trust in the broker's ability to handle their account by deferring to his decisions. 2) The broker's trades were excessively frequent or large. 3) The broker's actions were made deliberately and knowingly and were not in the best interest of the clients.

30.    The State of Oregon Division of Finance and Corporate Securities obtained information from a sample of former JWMI's clients[2] through questionnaires and interviews. The clients in the sample were typically individuals between the ages of 55 and 72 while the average age of JWMI clients was about 64. These clients explained how they became involved with JWMI, what their investment strategy was, what interactions they had with Millegan, and why they left JWMI.

    a.    Client E.A., born in 1950, stated that he moved his investments to JWMI in 2006 because he had family members who were clients of the firm. He had a moderate investment approach with the objective of appreciation and growth. E.A. felt that Millegan's strategy was speculation with all stock trading and few bonds. Millegan suggested all of the choices of trades and E.A. did not feel pressured and did not make any objections to the trades. His hope was that Millegan knew what he was doing. The fee structure was not explained to E.A. In one instance Millegan asked E.A. to transfer $30,000 from his bank account to JWMI so the money would be there when the bond market improved. E.A. decided to leave JWMI in February of 2015 when he lost

---

[2] One client chose not to answer the survey.

$100,000, had $50,000 in fees paid to Millegan, and had two other brokerage firms tell him that Millegan's fees were excessive.

b.      Client H.H., born in 1953, was introduced by his sister to JWMI. H.H. stated that when Millegan took over his qualified and non-qualified accounts, he continually churned the accounts by buying and selling individual stocks, some of which were extremely risky investments. H.H. felt that Millegan was making the trades to generate trading fees for himself and not to increase the value of the portfolio. After 6 or 7 years, the value of H.H.'s portfolio was much less than the initial investment even though H.H. had added at least another $100,000 to the accounts during that time. Many of the individual stocks that M i l l e g a n  invested in ended up having a $0 value. When H.H. asked Millegan to provide records about his fees and then amount of money he had invested with him, Millegan refused.

c.      Client B.W., born in 1942, has known Millegan and his wife since 1984 and considered them friends. At some point during his time with JWMI, the commission rate went from 1% to 2% on trades. Prior to the 2008 recession B.W. had a buy and hold strategy of value stocks, moving the holdings every 18-24 months. Millegan told B.W. that he was going to be a little more aggressive coming out of the recession so they could make up some returns. When B.W. saw the growing commission charges he kept asking why they are trading so much. In one instance on the phone with Millegan, B.W. asked Millegan about $7,000 in commissions he had made in the prior two months. Millegan put the phone aside and shouted to David Maisel, Millegan's analyst, "Hey Dave, B.W. is complaining about the commissions, he isn't saying anything about what we made him

Page 14 – Affidavit of Jason Nix

though." When B.W. asked an acquaintance to take a look at his accounts and see what he thought, the person told him he had never seen such an egregious strategy. He also told B.W. I don't care if you bring your accounts to me, but you need to move your accounts and get away from this broker. B.W. finally moved his accounts in early 2015 when he realized that he had been charged over $100k in commissions during one year. When Millegan realized B.W. was moving his accounts, he made several attempts to talk him out of it.

d.      Client P.C., born in 1949, has been Millegan's client since 1991. When she divorced her husband who had worked with Millegan, P.C. kept Millegan as her investment counselor. She had a moderate investment approach with the objective of appreciation and growth and was more conservative as she grew older. P.C. felt like Millegan never changed his strategy for her portfolio and kept 100% of her investments in stocks. Millegan would call P.C. with trade recommendations and she would always follow his advice. P.C. does not consider herself a sophisticated investor but she is educated with a Masters in Nursing. If there was a stock Millegan recommended to sell at a loss, P.C. would express her reluctance but Millegan would ignore her and tell her why the sale was the best move. P.C. never felt like she knew enough about the stock market to make a confident objection and felt like she was always talked into making trades even if she was unhappy with the trades. P.C. received trade confirmations with the fees listed, but the commissions and fee structure was never explained to her. P.C. had wanted to leave Millegan for at least 5 years but did not have the courage until a friend who was retiring introduced her to a different financial advisor who helped her leave Millegan.

e.     Client C.S., born in 1955, met Millegan as the result a stock gift from her grandparents. C.S. had a moderate investment approach with the objective of appreciation and growth. Millegan's strategy for C.S. was continuous buying and selling. C.S does not consider herself a sophisticated investor and had investment choices made by Millegan when he would call and tell her to buy or sell. C.S. rarely objected because when clients objected to trades there was pressure to do whatever Millegan said. When people that C.S. knew did not go along with Millegan, he would let them go. C.S. received information about buys and sells, but not information about the cost associated and the fee structure was never explained to her. After the market was coming back but C.S.'s account was still going down she decided to leave Millegan. She reviewed her statements and realized that over a two year period she paid $45,000 per year in fees. C.S. took a class about retirement and discovered there were other, less expensive ways to manage her investment. She felt that Millegan had not been honest and then left without giving explanations.

f.     Client B.K., born in 1948, is Millegan's cousin and has a moderate investment approach with the objective of appreciation and growth. B.K. does not consider herself to be a sophisticated investor and felt that Millegan seemed to promote a diversified portfolio. Prior to making changes to her portfolio, Millegan would call B.K. who only ever objected to investment in REI and state pension funds since she worked in those industries. She never felt pressured to go along with any trades. She understood the commission and fee structure to be the base amount since her account was small and

because it would help the account to grow. B.K. left JWMI because she wanted to consolidate her accounts.

g.      Client J.R., born in 1958, became affiliated with Millegan when the company he worked for brought Millegan in to help with 401K rollovers. He had a conservative investment approach with the goal of capital preservation. J.R. considers himself a sophisticated investor and believed Millegan's investment strategy to be equity trading. Millegan made the investment choices for J.R. who never objected to those choices. J.R. did not feel pressured by Millegan to accept trades. J.R. did receive reports of the commissions he paid and understood the commission and fee structure to be a percentage of the transaction. Ultimately J.R. got tired of the ups and downs of the market and moved his account to Raymond James for a more conservative approach.

h.      Client J.C. had known Millegan for years as friends and started working for him in April 2012 in Millegan's efforts to found an equestrian center. J.C. did not like working for Millegan and quit in June of 2012. J.C. also had investments with JWMI. When J.C. had conversations with other employees about Millegan, they would say that Millegan was only working on the equestrian project and hadn't had any new clients and the firm was stagnant. They also commented on the fact that all the money that came into the business went straight out to bills and that Millegan would come into the office on Friday and work really hard to get clients to make trades so he could get commissions so he could make payroll. For J.C.'s investment account, Millegan had convinced them to refinance their home in order to have money to invest with JWMI. J.C. said they were novice investors and trusted Millegan to take care of their investments. When J.C. received phone calls from Millegan it

was always to get the "ok" to make a trade. Millegan felt it was very important to get the ok, but he did not discuss investment strategy or let J.C. be involved in any investment decisions. Millegan never reevaluated J.C.'s investment needs or met with them. He would only call when he wanted to make a trade. When J.C. stopped working for Millegan, he called J.C. and said he had a deal to make and if J.C. didn't do it, he would close down all her investment accounts. J.C. then pulled all the investments out of the firm. When J.C. went to a new firm, they did not understand what Millegan was doing with the investments. J.C. did not understand how the fees they paid were calculated or how much they were paying.

31.     Based on the client statements, it appears that Millegan had control of the client accounts and that his clients lacked sophistication in financial matters, had a relatively small amount of experience in securities, did not do research on their own, and consistently demonstrated trust in Millegan's ability to handle their account by deferring to his decisions. It also appears that Millegan's trades were excessively frequent or large and that his actions were made deliberately and were not in the best interest of the clients.

32.     The calculation of Turnover Ratio, the number of times the equity in an account is traded in one year, is used to support of the claims of excessive trading and disregard for client interests. In October 2000, during the similar matter of J. Stephen Stout, a former Paine Webber salesperson who churned customer accounts, an SEC expert testified that Turnover Rate is a measure of the level of activity in an account. The expert suggested as a "rule of thumb" that "a turnover rate of two may be considered suggestive of excessive trading for a conservative investor. A turnover rate of four may be considered presumptive of excessive trading for a

conservative investor, and a turnover rate of six may be considered conclusive of excessive trading for a conservative investor."

33.     The calculation of Commissions to Equity Ratio, the fraction of the average equity in the account that is consumed by explicit trading costs, is also used to support the claims of excessive trading and disregard for client interests. In the ODFR referral letter to the Oregon U.S. Attorney's office, articles published by securities industry expert Craig McCann Ph.D., C.F.A., president of Securities Litigation and Consulting Group, were cited. Dr. McCann recommends that where the Turnover Ratio is above 2 and the Commissions to Equity Ratio is above 2 or 3%, churning is likely taking place. Based on the standards for both ratios, a sampling of eight client accounts managed by JWMI which each had an average of four years of account history were analyzed to determine if Millegan and his broker-dealer company might have engaged in a churning scheme intended to defraud JWMI clients.

34.     A sample of client trading activity, including trading in the accounts of some of the clients identified in paragraph 31 above, was used to analyze the Turnover Ratio and Commissions to Equity Ratio and included the accounts of the following individuals: L.B.W. (an account with a large total commission amount), P.G. (an account with a large total commission amount), G.H. (an account with a large total commission amount), A.D. (an account with a relatively small average balance of around $20,000), M.P. (an account with an average balance around $100,000), R.R. (an account with an average balance around $400,000), and E.A. (an account with an average balance around $490,000).

35.     For the eight sampled client accounts, the Turnover Ratio averaged 2.85 and the Commissions to Equity Ratio averaged 10.1%, meaning these were above the typical benchmark.

Page 19 – Affidavit of Jason Nix

For the sample set of eight clients, this activity resulted in commissions of $1,464,467 to Millegan between 2012 and 2016. Based on the interviews and calculated ratios, there is probable cause to believe that Millegan was engaging in excessive trading activity to the detriment of his clients for his own benefit.

36.    The churning activity further constitutes wire fraud due to the nature of communications and money movement by Millegan. The routine communications Millegan had with clients was via email and phone. He would call clients with suggested trades at various times. Clients E.A. and B.W. both recalled being contacted by Millegan via phone to discuss their accounts.

37.    Millegan also both received his commissions via bank transfer of funds and moved client funds via bank transfer of funds which creates wire activity. According to ODFR, in spite of his requirement to trade in the best interests of his clients, Millegan defrauded his clients by recommending trades as being in their best interest when in actuality he recommended those trades to generate a substantial income for himself. ODFR also found that Millegan's average trade volume for a 44 month period between January 2012 and October 2015 was 931 trades per month. IRS records show that between 2006 and 2014 Millegan claimed $7,658,686 of personal income from JWMI, a firm that, according to ODFR, only had 86 households as clients. Additional analysis of JWMI bank records found that the average total client holdings between 2012 and 2016 were $10,985,231 with a high of $17,539,418 in 2013. Based on several sources of information, I understand that during this time period Millegan was in need of funds to finance his development of a high end equestrian center in McMinnville, Oregon. Millegan

Page 20 – Affidavit of Jason Nix

testified at a bankruptcy hearing on February 02, 2017 that the equestrian project was a one-hundred million dollar project.


### Tax Evasion:  Evasion of Payment

38.     For every year from 2006 to 2016, Millegan hired the Portland, Oregon law firm Miller Nash Graham & Dunn LLP to prepare and file the federal income tax returns for himself and his businesses. Every year that Millegan filed, he reported income which generated a tax due to the IRS but he only made partial payments on that liability at later dates. The following chart shows the total tax Millegan self-assessed via his returns, taxes Millegan paid, and the remaining tax liability currently due to the IRS.

| Year | Date Received | Return Address | Total Tax Assessed | Amount Paid[3] | Penalties / Interest | Amount Due |
|------|---------------|----------------|--------------------|----------------|----------------------|------------|
| 2006 | 10/18/2007 | PO Box 615, Gleneden Beach, OR 97388 | $268,985.00 | $162,771.59[4] | $76,620.70 | $182,834.11 |
| 2007 | 10/18/2008 | PO Box 615, Gleneden Beach, OR 97388 | 414,492.00 | 2,648.00 | $124,229.17 | $536,073.17 |
| 2008 | 10/21/2009 | PO Box 615, Gleneden Beach, OR 97388 | 87,736.00 | 84,010.00 | $26,862.62 | $30,588.62 |
| 2009 | 10/18/2010 | PO Box 615, Gleneden Beach, OR 97388 | 207,516.00 | 471.29 | $101,076.58 | $308,121.29 |
| 2010 | 10/14/2011 | PO Box 615, Gleneden Beach, OR 97388 | 236,794.00 | 7,500.00 | $101,138.03 | $330,432.03 |
| 2011 | 10/15/2012 | PO Box 615, Gleneden Beach, OR 97388 | 169,618.00 | 15,400.00 | $12,161.57 | $166,379.57 |
| 2012 | 10/18/2013 | PO Box 615, Gleneden Beach, OR 97388 | 224,553.00 | 65,115.00 | $19,913.44 | $179,351.44 |
| 2013 | 12/15/2014 | PO Box 615, Gleneden Beach, OR 97388 | 260,757.00 | 2,072.00 | $49,088.97 | $307,773.97 |
| 2014 | 10/18/2015 | PO Box 1756, McMinnville, OR 97128 | 44,869.00 | 1,943.00 | $4,386.52 | $47,312.52 |
| 2015 | 10/21/2016 | PO Box 1610, McMinnville, OR 97128 | 3,445.00 | 720.00 | $177.45 | $2,902.45 |
| 2016 | 10/16/2017 | PO Box 1610, McMinnville, OR 97128 | 31,023.00 | $0.00 | $0.00 | $31,023.00 |

Total Paid:  **$342,650.88**    Total Tax Due:  **$2,122,792.17**

---

[3] The amount paid includes credits and levied amounts used to pay Millegan's tax liability as well as payments Millegan made.
[4] $125,012.97 of this payment is attributable to a successful account levy.

While accruing a personal income tax due to the IRS and making small late payments, Millegan took the following steps to evade IRS attempts to collect his tax liability.

39.    Between July 2009 and December 2015, Millegan utilized bank accounts in the names of businesses, including one owned by his spouse, at various financial institutions to conceal assets from the Internal Revenue Service. Millegan was the only signer on these accounts except for his wife's business account where she was also a signer. During this time period, I analyzed the activity in these bank accounts and I found that Millegan, all told, moved $7,005,272.92 through these accounts but he typically did it by depositing and then withdrawing or transferring the funds within a couple of day in order to frustrate the ability of the IRS to levy those funds. Millegan made this admission during a February 2017 bankruptcy hearing: when asked if he used the Eudora Millegan Trust account because it was not subject to attack from his creditors, Millegan responded "not creditors,well the IRS, yeah."

| Institution | Account Name | Signers | Date Opened | Transfers Start | Amount Transferred |
|---|---|---|---|---|---|
| Northern Trust Company | Wallace Bridge | JW Millegan | 03/01/2007 | 07/17/2009 | $218,136.58 |
| Northern Trust Company | JWMI | JW Millegan | 09/18/2009 | 11/12/2009 | $501,144.00 |
| US Bank | Eudora Millegan Trust | JW Millegan | 12/17/2010 | 12/20/2010 | $1,344,397.52 |
| Bank of America | Pilates for Parkinson's | JW & D Millegan | 07/07/2010 | 07/07/2011 | $65,834.80 |
| RBD Capital Markets | JWMI | JW Millegan | 02/22/2012 | 03/05/2012 | $3,569,049.63 |
| RBD Capital Markets | Carlton LLC | JW Millegan | 02/22/2012 | 03/05/2012 | $1,184,505.01 |
| RBC Capital Markets | Maolagain | JW Millegan | 02/22/2012 | 03/12/2012 | $122,205.38 |
| | | | | [5]Total Amount Transferred: | $7,005,272.92 |

40.    At various times during the collection process Millegan provided financial information as an initial response or updated response to a request by the IRS Revenue Officer

---

[5] Duplicate transfers were taken out of the analysis.

assigned to the case. This information included false statements from Millegan:

        a.    In May of 2011 Millegan provided a Form 433-A Collection Information

Statement for Wage Earners and Self-Employed Individuals in which he disclosed the

existence of Carlton LLC and Maolagain LLC (entities he controlled) to the IRS but

omitted the existing related bank accounts for these entities and the transfers of funds that

took place in these accounts. During a January 2015 sworn statement to the IRS,

Millegan described Maolagain as a company that holds computers and other assets

because JWMI cannot have debt. Between 2012 and 2015, the money that went into

Millegan's Maolagain LLC bank account was commission money that Millegan earned

at JWMI. During a bankruptcy hearing in February 2017, Millegan also stated that

Maolagain was created to hold assets and debt.

        b.    On January 22, 2013 Millegan provided to the Revenue Officer a Form

433-A Collection Information Statement for Wage Earners and Self-Employed

Individuals, and on March 6, 2013 Millegan provided another Form 433-A Collection

Information Statement for Wage Earners and Self-Employed Individuals. Both of these

forms omitted his Northern Trust Company and RBC Capital Markets bank accounts.

The Revenue Officer did not discover these accounts as levy sources until November 03,

2014 after Millegan had redirected a total of $1,764,891.58 through the undisclosed

accounts. On that same form, Millegan claimed that his total household income was

$40,800 per month, or $489,600 per year, but his 2012 Personal Income Tax Form 1040

(filed after March 6, 2013) showed that Millegan claimed a gross annual income of

$847,619 and his 2013 Personal Income Tax Form 1040 showed Millegan claimed a

gross annual income of $850,787.

41.    During a sworn statement that Millegan gave on January 25, 2015 to the Revenue Officer assigned to the case, he admitted that the reason he doesn't keep assets in his own bank account was because there were too many IRS levies on his accounts. Millegan also claimed the only method he had to pay his taxes was through the cash flow from his business, but that he did not have sufficient cash flow to pay his taxes. However, according to Millegan's bank account activity, between March 05, 2012 and January 25, 2015, he had moved at least $3,569,049.63 in commission income through his accounts.

42.    On May 01, 2011 Millegan used Carlton LLC to lease 8390 Sawtell Road, Sheridan, Oregon 97378 with the option to purchase. On that same date Millegan established a lease agreement for the property between Carlton LLC and JWMI. The agreement required a monthly rent payment of $8,000 ($96,000 annually) from JWMI. I believe Millegan knew that the IRS could not levy Carlton LLC because the IRS had no tax assessment against Carlton, so he began making transfers in excess of the amounts in the lease agreement between JWMI and Carlton LLC. Millegan transferred $279,928 in 2012 ($183,928 in excess of the $96,000 annual rent), $414,646 in 2013 ($318,646 in excess of the $96,000 annual rent), $312,238 in 2014 ($216,238 in excess of the $96,000 annual rent), and $177,693 in 2015 ($81,693 in excess of the $96,000 annual rent). In this way, Millegan put money that could have been used to pay down his tax liability beyond the reach of the IRS, and evaded payment of that liability.

**False Statements In Bankruptcy Proceeding**

43.    On January 5, 2017, shortly after FINRA ordered that Millegan pay two clients $447,000 at 9 percent interest, Millegan and Debra Millegan filed for Chapter 7 bankruptcy in

Page 24 – Affidavit of Jason Nix

United States Bankruptcy Court for the District of Oregon. In the filed petition, the Millegans indicated they had an estimated number of creditors in the amount of 1-49. They also estimated their assets to be worth $0-$50,000, and liabilities to be $1,000,001-$10 million. But 11 months earlier, in February 2016, Millegan had given ODFR a balance sheet showing over $800,000 in personal property, including collectible books, art, antiques, and jewelry. On January 20, 2017, the Millegans filed an amended petition for Chapter 7 bankruptcy. In contrast to the first petition, their estimated assets were listed as being in the range of $500,001-$1 million, as opposed to $0-$50,000.

44.     On February 02, 2017, Millegan and his wife testified under oath at a bankruptcy hearing. Millegan testified that his oldest son, Drew Millegan, is a registered and licensed stock broker who has started a hedge fund business that Drew operates out of the house at 624 NE 2nd Street, McMinnville, OR 97128. Drew Millegan rents[6] the house.

45.     According to FINRA records last updated on September 30, 2016, Drew Millegan is a registered financial advisor employed by JWMI with 1 year of experience. Drew Millegan is registered in the state of Oregon and passed two securities exams, one in June 2016 and one in July 2016.

46.     At the bankruptcy hearing, Millegan testified that he and his wife live at the house (624 NE 2nd Street, McMinnville) and have a bedroom there, which he receives in exchange for advising the hedge fund. Millegan also stated that he does not typically handle his own bills and finances. Instead, Millegan stated his son Drew handles this for him. Millegan stated he has used

---

[6] Rent checks for $1,800 were paid to Meredith Kendall from the Woodworth Contrarian Advisors LLC account at Maps Credit Union on 01/11/17, 02/22/17 ( note: "624 NE 2nd St Rent March"), 02/22/17 (note: "624 NE 2nd St Rent"), and on 04/13/17 for $5,400.00 (note: "624 NE 2nd St Rent Apr, May, Jun").

bank statements, QuickBooks or Quicken records, and excel sheets to track his expenses, and he has access to those records and would be able to provide them to the bankruptcy court.

47.    During the same bankruptcy hearing on February 02, 2017, Millegan admitted that he moved money through the Eudora Millegan Trust bank account because it was not subject to attack by the IRS. Therefore, I believe records related to Millegan's finances, including efforts to evade payment of his income taxes, will be found at his current residence, 624 NE 2nd Street, McMinnville. Further, due to Drew's involvement in handling Millegan's bills and finances, it is likely the location of Millegan's records will not be limited to Millegan's bedroom, but will be found in other areas of the house used by Drew.

48.    Millegan further testified at the bankruptcy hearing that his business, JWMI, has a storage unit in McMinnville with boxes of papers that are kept due to FINRA retention requirements. The storage facility is on Lafayette Avenue in McMinnville, Oregon.

49.    During the same bankruptcy hearing Millegan made material statements that appear to be false, including (1) a failure to make a full accounting of the accounts in his name or holding money belonging to him, and (2) identifying himself as only an advisor to the Woodworth Contrarian Stock & Bond Fund. Those statements, in pertinent part, include the following:

   a.    When asked whether he had any other bank or credit union accounts at the time of filing besides those at OnPoint, Bank of America, and Northern Trust, the only additional account for which he provided information was the Eudora Millegan Trust. Trustee Amy Mitchell (Mitchell) again asks, "So your main accounts are the OnPoint, the Northern Trust, and Bank of America, is that correct?" Millegan

Page 26 – Affidavit of Jason Nix

responded, "Hers is Bank of America." Mitchell asked, "Okay. Did you have any money in someone else's account at the time of filing?" Millegan stated, "No." However, I have identified bank accounts in the name of Woodworth Contrarian Advisors, LLC. at Key Bank on which Millegan, at the time he testified, had signature authority.

b. Regarding the hedge fund, the following exchange occurred between Mitchell, Millegan, and Caroline Smith (Smith), an employee of the Division of Financial Regulation:

AM: Did any of the accounts [from the dealer-broker firm] get transferred to, uhm, an entity or individual that you are related to? Have a financial relationship with?"

JM: My son, my son has started . . . has a firm. Has started a hedge fund.

CS (Caroline Smith): And is this your 21 year old son or the other one?

JM: 20, he is registered and licensed, yes.

CS: And he's running a hedge fund?

JM: Correct.

CS: And where is that operating from?

JM: He actually . . . he operates out of the house.

CS: And what is your role in his business?

JM: I don't own anything. He's my son.

CS: Do you provide any services to, the, uhm, business?

JM: I advise him.

CS: And what is the name of the business?

Page 27 – Affidavit of Jason Nix

JM: Woodworth Contrarian Stock & Bond Fund.

CS: Okay. And what kind of advice do you give to him?

JM: I have 33 years of experience in buying and selling stocks.

CS: Are you meeting with clients?

JM: No.

CS: Have you met with any clients?

JM: Yes, I have.

CS: Are you giving them any financial advice?

JM: The advice is to the hedge fund.

CS: But you are meeting with clients? Are these hedge fund clients or your clients?

JM: They are hedge fund clients, they are not my clients.

CS: Okay, but they, but they were your clients?

JM: Correct.

CS: And you are meeting with the clients of the hedge fund?

JM: At the hedge fund which is duly registered.

CS: And it's operating from your house.

JM: Not my house. It's my son's house.

CS: The house where you are living?

JM: Correct.

50.    Although Millegan testified that he was only an advisor to the hedge fund, there is reason to believe Millegan plays a more significant role in the company. First, as noted by

Page 28 – Affidavit of Jason Nix

Millegan in his testimony, he has over 30 years of experience buying and selling stocks. In contrast, his son Drew was only 20 years old at the time of the hearing. In addition, some of the clients of the hedge fund are former clients of JWMI, meaning Millegan was their previous broker-dealer before the collapse of JWMI.

51.     Millegan further testified that his business, JWMI, has a storage unit in McMinnville with boxes of papers from JWMI that are kept due to FINRA retention requirements. The storage facility, McMinnville Self-Stor, is at 2600 NE Lafayette Avenue in McMinnville, Oregon.   Analysis of bank records shows several entities Millegan controlled – Carlton LLC, JW Millegan, Inc., and Maolagain LLC – and Drew Millegan himself (by credit card), have paid the rental fees for this storage unit for several years.   In addition, in May 2017, Drew Milligan used his credit card to pay for two storage units at Your Space Public Storage, located at 1500 Lafayette Avenue in McMinnville, Oregon. As a result, I believe documents and records related to JWMI and Woodworth Contrarian are likely to be found in these three storage units. Because several JWMI clients were transferred to the Woodworth Contrarian Stock & Bond Fund there is probable cause to believe JWMI client records will also be located at 624 NE 2nd Street.

## Other Activities

### Corporate Filings with State and Federal Agencies

52.     According to the Oregon Secretary of State Corporation Division, Woodworth Contrarian Stock and Bond Fund L.P. was registered on December 01, 2016. It was incorporated in the State of Delaware and lists an address of 624 NE 2nd Street, McMinnville, OR 97128 for

Page 29 – Affidavit of Jason Nix

the office address. Drew Millegan is listed as the manager and signed the registration application as the only general partner although the only general partner listed is Woodworth Contrarian Management LLC.

53.    According to the Oregon Secretary of State Corporation Division, Woodworth Contrarian Management LLC was registered on November 17, 2016. It lists an address of 624 NE 2nd Street, McMinnville, OR 97128 for the business mailing address.

54.    According to the Oregon Secretary of State Corporation Division, Millegan Brothers, LLC was registered on September 09, 2016. It lists an address of 624 NE 2nd Street, McMinnville, OR 97128 for the business mailing address. The organizers are listed as Drew Millegan and Quinn Millegan.

55.    According to filings with the Securities and Exchange Commission, Woodworth Contrarian Stock and Bond Fund has a business and mailing address of 624 NE 2nd Street, McMinnville, OR 97128. The executive officer is listed as Drew Millegan. The date of first sale was December 14, 2016 and the minimum investment accepted is $100,000, and there were 28 investors who had already invested in the fund. The same Notice of Exempt Offering of Securities was filed twice in December 2016 and once in June 2017. The June 2017 filing also listed the minimum investment accepted as $100,000 and the number of clients who had already invested as 28.

## Social Media

56.    On October 25, 2017, I saw that Millegan has a Facebook page where he shares that he lives in McMinnville, Oregon and is a founder at Woodworth Contrarian Stock and Bond

Fund, which he describes as a hedge fund.  He also refers to the hedge fund as his "son's hedge fund".

57.    Also on October 25, 2017, I saw that Drew Millegan has a Facebook page where he shares that he studied at Linfield College. Drew Millegan does not identify any employment for himself and does not state he is associated in any way with Woodworth Contrarian.

### Surveillance

58.    On March 22, 2017 a physical surveillance was conducted on 624 NE 2nd Street, McMinnville, OR 97128. At 10:40 a.m., a white GMC Yukon with Oregon license plate YXU 246 and a blue GMC Terrain with Oregon license plate 150 JBS were observed in front of the residence. According to Oregon Department of Motor Vehicles, these vehicles are registered to Maolagain, a business owned by Millegan and Debra Millegan, and Drew Millegan respectively. Insurance records indicate that Debra and James Millegan were the drivers of the GMC Yukon. The following took place:

a.    At 11:21 a.m. a female matching the description of Debra Millegan left the residence and drove away in the white GMC Yukon.

b.    At 1:04 p.m. a male fitting the description of Drew Millegan left the residence wearing a dark suit and carrying what appeared to be envelopes. Drew Millegan returned to the residence at 1:08 p.m. carrying what appeared to be envelopes.

c.    The surveillance was terminated at 4:30 p.m..

59.    On September 29, 2017 a physical surveillance was conducted on 624 NE 2nd Street, McMinnville, OR 97128. At about 8:00 a.m., a Volkswagen Touareg with Oregon license plate 956 FJG and a GMC with Oregon license plate 150 JBS were observed in front of the

Page 31 – Affidavit of Jason Nix

residence. According to Oregon Department of Motor Vehicles, these vehicles are registered to Maolagain, a business owned by Millegan and Debra Millegan, and Drew Millegan respectively. The following took place:

      a.    At 9:00 a.m. an unknown older man with a thin build exited the residence wearing a blue jacket and cowboy hat. He did not match the description of Millegan or his sons. The man walked over to the post office and went inside. He did not appear to be carrying anything. The man exited the post office and got into a van with the logo for AM Radio Station 1260 on the side.

      b.    At 9:21 a.m. a female matching the description of Debra Millegan exited the residence. A male matching the description of Millegan, dressed in a dress shirt, tie, and dress pants walked the female to the car. Debra Millegan drove away in the Volkswagen Touareg with Oregon license plate 956 FJG. Millegan then began talking on his phone and stayed on the porch before going back inside the house.

      c.    At 11:43 a.m. Millegan was seen returning to the residence, on foot, dressed in a suit and tie and carrying something that appeared to be envelopes.

      d.    At 11:46 a.m. a male fitting the description of Drew Millegan, dressed in a suit and tie exited the residence. He went to the driver's side of the vehicle with Oregon license plate 150 JBS, opened it, retrieved something, and closed the car and went back into the residence.

      e.    At 12:35 p.m. a male fitting the description of Quinn Millegan, Millegan's youngest son, wearing jeans and an untucked flannel shirt, exited the residence and went to a Hyundai vehicle with temporary license plate in the back window and put a large bag

Page 32 – Affidavit of Jason Nix

in the back of the vehicle. Quinn Millegan then went back in the residence and exited the residence again accompanied by Millegan. Quinn Millegan got into the Hyundai and drove away while Millegan stayed on the front porch.

60.    The surveillance was terminated at 1:05 p.m.

### Public Records

61.    On October 10, 2017, Yamhill Valley News-Registerlocated in McMinnville, Oregon published an article reporting that Millegan is operating as a hedge fund manager and that he claimed publicly his fund is bankrolling a project called Volta PowerGen which is developing generators that will be fueled by landfill gases. [7]

62.    On October 25, 2017, I saw that Millegan's Facebook page states that the Volta PowerGen project "has been fully funded by Woodworth Contrarian Stock and Bond Fund, with no public funds, and looks like it will result in new family wage jobs for Yamhill County."

### Subpoenas

63.    On October 27, 2017, a subpoena was served on Your Space Public Storage located in McMinnville, Oregon. The documents provided confirmed that Drew Millegan used the business name Millegan Brothers. LLC to rent Unit #2020 and #G148 at Your Space Public Storage. The lease began on August 20, 2016 and listed the Millegan Brothers., LLC street address of 624 NE 2nd Street, McMinnville, OR 97128. Quinn Millegan signed the leases as the Lessee. The ledger history provided by Your Space Public Storage show that rent for the units

---

[7] On Millegan's Facebook page he states that the newspaper article contained false statements about him and that his son ran the hedge fund.

has been paid through November 30, 2017. Gate activity provided by Your Space Public Storage shows that the units are accessed a few times each month.

64.     On October 27, 2017, a subpoena was served on McMinnville Self Stor located in McMinnville, Oregon. The office manager verified that Maolagain LLC, in care of James Millegan, rents Unit #B168 at McMinnville Self Stor.  It was also confirmed that the storage unit is still active.

65.     Based on my training and experience along with the information that shows that Millegan and Drew Millegan participate in Woodworth Contrarian, I believe that Millegan lives at 624 NE 2nd Street, McMinnville, OR 97128 and that Millegan and Drew Millegan are maintaining records at the residence/business as well as at the storage units located at 2600 NE Lafayette Avenue Unit #B168, McMinnville, OR 97128 and 1500 NE Lafayette Avenue Unit #2020 and #G148, McMinnville, OR 97128.


## SECTION IV
## SEARCH AND SEIZURE OF DIGITAL DATA

66.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the Premises, in whatever form they are found.  One form in which the records will likely be found is data stored on a computer's hard drive, on other storage media, or other digital devices, including cell phones (hereinafter collectively referred to as digital devices).  Thus, the warrant applied for would authorize the seizure of electronic storage media or the copying of electronically stored information, all under Rule 41(e)(2)(B).


Page 34 – Affidavit of Jason Nix

67.     There is probable cause to believe, and I do believe, that records will be stored on a digital device because, based on my knowledge, training, experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, that:

a.     Data in digital form can be stored on a variety of systems and storage devices, including hard disk drives, floppy disks, compact disks, magnetic tapes, flash drives, and memory chips.  Some of these devices can be smaller than a thumbnail and can take several forms, including thumb drives, secure digital media used in phones and cameras, personal music devices, and similar items.

b.     Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a digital device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  When a person "deletes" a file on a digital device, the data contained in the file does not actually disappear; rather, that data remains on the digital device until it is overwritten by new data.  Therefore, deleted files or remnants of deleted files, may reside in free space or slack space—that is, in space on the digital device that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, digital devices—in particular, internal hard drives—contain electronic evidence of how a digital device has been used,

Page 35 – Affidavit of Jason Nix

what it has been used for, and who has used it. To give a few examples, this forensic

evidence can take the form of operating system configurations, artifacts from operating

system or application operation, file system data structures, and virtual memory "swap"

or paging files. Digital device users typically do not erase or delete this evidence,

because special software is typically required for that task. However, it is technically

possible to delete this information.

       d.      Similarly, files that have been viewed via the Internet are sometimes

automatically downloaded into a temporary Internet directory or "cache."

       e.      Based on actual inspection of other evidence related to this investigation,

(spreadsheets, financial records, invoices, and email), I am aware that digital devices

were used to generate, store, and print documents used in the Wire Fraud, Manipulative

and Deceptive Devices, Bankruptcy Fraud, and the Evasion of Payment of his personal

income tax. Thus, there is reason to believe that there is a digital device currently located

on the Premises.

68.      As further described in Attachment B, this application seeks permission to locate

not only computer files that might serve as direct evidence of the crimes described on the warrant

but also for forensic electronic evidence that establishes how digital devices were used, the

purpose of their use, who used them, and when. There is probable cause to believe that this

forensic electronic evidence will be on any digital device in the Premises, because, based on my

knowledge, training, and experience, I know:

       a.      Data on the digital device can provide evidence of a file that was once on

      the digital device but has since been deleted or edited, or of a deleted portion of a file

Page 36 – Affidavit of Jason Nix

(such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the digital device that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the digital device was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

      b.      Forensic evidence on a digital device can also indicate who has used or controlled it. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, email, email address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time. Further, forensic evidence on a digital device can show how and when it was accessed or used. Such "timeline" information allows the forensic analyst and investigators to understand the chronological context of access to the digital device, its use, and events relating to the offense under investigation. This "timeline" information may tend to either inculpate or exculpate the user of the digital device. Last, forensic evidence on a digital device may provide relevant insight into the user's state of mind as it relates to the offense under

Page 37 – Affidavit of Jason Nix

investigation.  For example, information on a digital device may indicate the user's

motive and intent to commit a crime (e.g., relevant web searches occurring before a crime

indicating a plan to commit the same), consciousness of guilt (e.g., running a "wiping

program" to destroy evidence on the digital device or password protecting or encrypting

such evidence in an effort to conceal it from law enforcement), or knowledge that certain

information is stored on a digital device (e.g., logs indicating that the incriminating

information was accessed with a particular program).

      c.      A person with appropriate familiarity with how a digital device works can,

after examining this forensic evidence in its proper context, draw conclusions about how

digital devices were used, the purpose of their use, who used them, and when.

      d.      The process of identifying the exact files, blocks, registry entries, logs, or

other forms of forensic evidence on a digital device that are necessary to draw an

accurate conclusion is a dynamic process.  While it is possible to specify in advance the

records to be sought, electronic evidence is not always data that can be merely reviewed

by a review team and passed along to investigators.  Whether data stored on a digital

device is evidence may depend on other information stored on the digital device and the

application of knowledge about how a digital device behaves.  Therefore, contextual

information necessary to understand other evidence also falls within the scope of the

warrant.

      e.      Further, in finding evidence of how a digital device was used, the purpose

of its use, who used it, and when, sometimes it is necessary to establish that a particular

thing is not present on a digital device.  For example, the presence or absence of counter-

Page 38 – Affidavit of Jason Nix

forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

69.     In most cases, a thorough search of the Premises for information that might be stored on a digital device often requires the seizure of the device and a later, off-site review consistent with the warrant. In lieu of removing a digital device from the Premises, it is sometimes possible to image or copy it. Generally speaking, imaging is the taking of a complete electronic picture of the digital device's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the digital device and to prevent the loss of the data either from accidental or intentional destruction. This is true because:

a.     As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a digital device has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine digital devices to obtain evidence. Digital devices can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.     Records sought under this warrant could be stored in a variety of formats that may require off-site reviewing with specialized forensic tools. Similarly, digital devices can be configured in several different ways, featuring a variety of different

Page 39 – Affidavit of Jason Nix

operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the digital device off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

70.     Because several people share the Premises as a residence, it is possible that the Premises will contain digital devices that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those digital devices, the warrant applied for would permit the seizure and review of those items as well.

71.     In my training and experience, it is likely that the Premises will contain at least one Apple brand device, such as an iPhone or iPad, because bank records show multiple purchases at the apple online store.

72.     I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple devices such as iPhones and iPads offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID.

73.     If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID

Page 40 – Affidavit of Jason Nix

sensor, which is found in the round button (often referred to as the "home" button) found at the bottom center of the front of the device. In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

74.     In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead. These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made.

75.     The passcode or password that would unlock the Apple device found during the search of the Premises is not known to law enforcement. Thus, it will likely be necessary to press the fingers of the users of the Apple device found during the search of the Premises to the device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant Apple device(s) via Touch ID with the use of the fingerprints of the users is necessary because the government may not

Page 41 – Affidavit of Jason Nix

otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

76.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device via Touch ID, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any occupant of the Premises to press their fingers against the Touch ID sensor of the locked Apple device found during the search of the Premises in order to attempt to identify the device's user(s) and unlock the device(s) via Touch ID. Based on these facts and my training and experience, it is likely that James W Millegan, Debra Millegan, or Drew Millegan are users of the device(s) and thus that their fingerprints are among those that are able to unlock the device via Touch ID.

77.     Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience I know that it is common for a user to unlock a Touch ID-enabled Apple device via the fingerprints on thumbs or index fingers. In the event that law enforcement is unable to unlock the device(s) found in the Premises as described above within the five attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

Page 42 – Affidavit of Jason Nix

78.     I therefore request that the Court authorize law enforcement to press the fingers, including thumbs, of the above-named individuals found at the Premises to the Touch ID sensor of the device(s), such as an iPhone or an iPad, found at the Premises for the purpose of attempting to unlock the device(s) via Touch ID in order to search the contents as authorized by this warrant.

79.     *Nature of the examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which I apply would permit seizing, imaging, or otherwise copying digital devices that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the device or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire device, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

80.     The initial examination of the digital device will be performed within a reasonable amount of time not to exceed 120 days from the date of execution of the warrant. If the government needs additional time to conduct this review, it may seek an extension of the time period from the Court within the original 120-day period from the date of execution of the warrant. The government shall complete this review within 180 days of the date of execution of the warrant. If the government needs additional time to complete this review, it may seek an extension of the time period from the Court.

81.     If, at the conclusion of the examination, law enforcement personnel determine that particular files or file folders on the digital device do not contain any data falling within the scope of the warrant, they will not search or examine those files or folders further without

Page 43 – Affidavit of Jason Nix

authorization from the Court. Law enforcement personnel may continue to examine files or data falling within the purview of the warrant, as well as data within the operating system, file system, software application, etc., relating to files or data that fall within the scope of the warrant, through the conclusion of the case.

82.     If an examination is conducted, and the digital device does not contain any data falling within the ambit of the warrant, the government will return the digital device to its owner within a reasonable period of time following the search and will seal any image of the digital device, absent further authorization from the Court.

83.     The government may retain the digital device as evidence, fruits, contraband, or an instrumentality of a crime or to commence forfeiture proceedings against the digital device and/or the data contained therein.

84.     The government will retain a forensic image of the digital device for a number of reasons, including proving the authenticity of evidence to be used at trial, responding to questions regarding the corruption of data, establishing the chain of custody of data, refuting claims of fabricating, tampering, or destroying data, and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

85.     The government has made the following prior efforts in other judicial fora to obtain evidence sought under the warrant: IRS administrative summons and grand jury subpoenas.

## SECTION V
### Filter Team

86.    I understand that Millegan has been and is currently represented by attorneys and that during the search warrant potential attorney-client privileged materials and attorney work product materials may be present at the search warrant sites and might be seized.  To prevent disclosure of privileged or work product materials, a filter team will first review all seized materials pursuant to the standard filter protocol of the U.S. Attorney's Office for the District of Oregon.

## SECTION VI
## CONCLUSIONS OF THE AFFIANT

87.    Based on the foregoing facts and circumstances, as well as my training and experience and the experience of other agents, I have probable cause to believe that James Woodworth Millegan has engaged in various violations of the federal criminal code. I believe that there is probable cause that evidence, fruits, instrumentalities, and proceeds of illegal activity including Wire Fraud, Manipulative and Deceptive Devices (churning), False Statements in a Bankruptcy Proceeding, and Tax Evasion will be found at 624 NE 2nd Street, McMinnville, OR 97128, in storage unit #B168 at 2600 NE Lafayette Avenue, and at storage units #2020 and #G148 at 1500 Lafayette Avenue, both in McMinnville, OR 97128, as further described in Attachment A.  Such evidence, fruits, instrumentalities, and proceeds of illegal activity to be searched for at the location set forth in Attachment A are for the period of time beginning January 1, 2009 to the present, and the items to be seized are more fully described in Attachment B.  The aforementioned attachments are incorporated herein.

88.    Accordingly, I respectfully request search warrants for the locations described in Attachment A for the items described in Attachment B.

89.    This affidavit was reviewed and approved by Assistant United States Attorney Seth D. Uram.

## **Request for Sealing**

90.    I further request that the Court issue an order sealing, until further order of the Court, all papers submitted in support of the requested search warrant, including the application, this affidavit, the attachments, and the requested search warrants.  I believe that sealing these documents is necessary because premature disclosure of the information in this affidavit and of the search warrants may cause destruction of or tampering with evidence, cause intimidation of potential witnesses, or otherwise jeopardize this investigation.


Jason Nix, Special Agent
IRS – Criminal Investigation

Subscribed and sworn to before me this ___13th___ day of ___Nov___ 20_17_


PAUL J. PAPAK
United States Magistrate Judge


Page 46 – Affidavit of Jason Nix

## ATTACHMENT A

## PROPERTIES TO BE SEARCHED

<u>Residence of James Millegan & Business Location for Woodworth Contrarian Stock & Bond</u>

The main property to be searched is 624 NE 2nd Street, McMinnville, OR 97128, further described as a single family, two level residence with a brick chimney on the east side and steps leading to the front porch and main entrance. The residence is primarily a brown color with a stone façade around the front porch and a shared parking area to the left of the house.



McMinnville Self-Stor [sic]

This property is located at 2600 NE Lafayette Avenue, Unit #B168, McMinnville, OR 97128. The location is a fenced storage facility with four buildings housing single storage units. A sign at the entrance of the property has the name McMinnville Self-Stor at the top and a mail box on the opposite side of the entrance has the number 2600. The office is located near the entrance and has the number 2600 displayed on the corner of the building just below the roof.



Your Space Public Storage

This property is located at 1500 NE Lafayette Avenue, Units #2020 and #G148, McMinnville, OR 97128. The location is a fenced storage facility with multiple buildings housing single storage units. A sign at the entrance of the property has the name Your Space Storage at the top. The office is located near the entrance and has the number 1500 displayed just below the word office to the right of the office entrance.



Page 2 – Affidavit of Jason Nix

**ATTACHMENT B**

**I. Items to be Seized**

1. The items to be searched for, seized, and examined, are those items on the premises located at 624 NE 2nd Street, McMinnville, OR 97128, 2600 NE Lafayette Avenue #B168, McMinnville, OR 97128, and 1500 NE Lafayette Avenue Units #2020 and #G148, McMinnville, OR 97128 referenced in Attachment A, that are evidence, contraband, fruits, and instrumentalities of Wire Fraud (18 U.S.C. § 1343); Manipulative and Deceptive Devices (churning) (15 U.S.C. § 78j(b); False Statements Under Oath in a Bankruptcy Proceeding (18 U.S.C. § 152(2); and Tax Evasion (26 U.S.C. § 7201). The items to be seized relate to the following persons and entities for the periods of January 1, 2009 to present:

Name: James W Millegan
Possible SSN: 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

Name: Debra Millegan
Possible SSN: 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

Name: Drew Millegan
Possible SSN: 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

Name: Millegan Brothers
Possible EIN: 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

Name: Eudora W Millegan Trust
Possible EIN: 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

Name: JW Millegan Inc
Possible EIN: 93-1186884

Name: Maolagain LLC
Possible EIN: 93-1238613

Name: Carlton LLC
Possible EIN: 27-3788174

Name: Woodworth Contrarian Advisors LLC
Possible EIN: 93-1186884

Name: Pilates For Parkinson's
Possible EIN: 27-2877008

Name: Woodworth Contrarian Management LLC
Possible EIN: 81-4462621

Name: Woodworth Contrarian Stock And Bond Fund LP
Possible EIN: N/A

Name: Wallace Bridge
Possible EIN: N/A

Page 3 – Affidavit of Jason Nix

2. The items referenced above to be searched for, seized, and examined include all records including records of digital communications, including:

    a. Client new account information, client lists, client communications including recordings, electronic and/or paper client orders, client authorizations for trades, client agreements, contracts, materials advertising services, prospectus, gross receipts, purchase receipts, invoices, tracking data, description of the securities transacted, disposition of proceeds, quantity bought or sold, date of transactions, purchase or sales price, commissions paid, and other sales information.

    b. Broker-dealer records including but not limited to all notes, memoranda (informal or formal), financial statements, background or credit investigations, records disclosing the stock transfer agent and dividend disbursing agent, solicitations of other investment products, and records of commissions generated.

    c. Financial transactions with or on behalf of the above listed parties and or clients of the above listed parties, as well as information that reveals the dates, amounts, disposition of proceeds, and purpose of all payments by the above including checks (front and back) and electronic funds transfers issued to the above listed parties as a result of these transactions.

    d. Financial accounts open or closed whether held jointly or severally, as a trustee or fiduciary as well as custodian, executor, guardian or nominee including the disclosure of the types of accounts held.

    e. All account records of security transactions including all agreements, contracts, applications for account, signature cards, all records relative to treasury notes or certificates of deposit purchased, cash accounts, ready asset accounts, mutual fund accounts, commodity accounts, margin accounts, or other accounts. Such records including cash receipts, confirmation slips, securities delivered receipts, statements of account, notifications of purchase or sale, representative's stock record, account executive worksheets, ledger sheets, cash in slips, buy and sell slips, or other records of these transactions.

    f. All assets purchased.

3. Financial records including bank statements, cancelled checks, deposit records, check stubs, payment ledgers, checkbook registers, deposit slips, loans, documentation of assets and liabilities, duplicate checks, bank debits, cashier's checks and money order records, wire transfer records, general ledgers, general journals, cash receipts, cash disbursement

journals, accounts receivable journals, accounts payable journals, contracts, billing information, records of bills relating to the receipt of currency or other forms of payment, correspondence to and from an accountant, and records created by an accountant or bookkeeper.

4. Financial records showing the acquisition and disposition of assets including insurance records showing assets insured, net worth statements, financial statements, loan applications, and transactions showing transfer of ownership.

5. Cash or other evidence of gross receipts, profits, and asset accumulation.

6. Records of credit cards indicating the expenditure of income.

7. QuickBooks, Excel, Deltek, and other computer accounting files and records, including all spreadsheets relating to income, expenses, or financial information.

8. Ledgers, profit distribution reports, financial statements, profit and loss statements, balance sheets, income statements, or work progress reports.

9. Copies of tax returns and related tax preparation files to include:

   a. Work papers, schedules, receipts, and any other source documents comprising evidence of asset acquisition, expenditures, and sources of income.

   b. Tax forms including, Forms W-2, Forms W-4, Forms 941, Forms 940, Forms 1040, and Forms1099.

10. Business licenses, stock certificates, logs of stock purchases and redemptions, joint venture agreements, subcontract agreements, lease agreements, and employee sharing agreements.

11. Notes payable and receivable, IOUs and other recordation of debts comprising evidence of loans and expenses.

12. Papers, records, documents, files, notes, memos, mail or other materials representing residency, ownership, occupancy, dominion or control of the premises referenced above and described in Attachment A.

13. All tangible assets including cash, bullion, jewelry, antique automobiles, collectible coins.

14. Records or keys showing possession of safe deposit boxes, safes, storage units, and any other type of storage areas, including passwords and/or access codes for access during the searches.

Page 5 – Affidavit of Jason Nix

15. Computers and digital or electronic storage media.

16. As used in this attachment, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form. The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware. The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

17. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a. Evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. Evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. Evidence of the lack of such malicious software;

   d. Evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

   e. Evidence indicating the computer user's state of mind as it relates to the crime under investigation;

   f. Evidence of the attachment to the COMPUTER of other storage devices or similar

containers for electronic evidence;

g. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. Evidence of the times the COMPUTER was used;

i. Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. Documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER.

k. Records of or information about Internet Protocol addresses used by the COMPUTER;

l. Records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. Contextual information necessary to understand the evidence described in this attachment.

## II. Search Procedure

1. In searching for data capable of being read, stored, or interpreted by a computer or storage device, may require authorities to employ techniques, including imaging any computer or storage media and computer-assisted scans and searches of the computers and storage media that might expose many parts of the computer or storage media to human inspection in order to determine whether it constitutes evidence as described by the warrant.

A. The initial examination of the computer and storage media will be performed within a reasonable amount of time not to exceed 120 days from the date of execution of the warrant. If the government needs additional time to conduct this review, it may seek an extension of the time period from the Court within the original 120-day period from

Page 7 – Affidavit of Jason Nix

the date of execution of the warrant. The government shall complete this review within 180 days of the date of execution of the warrant. If the government needs additional time to complete this review, it may seek an extension of the time period from the Court.

B. If, at the conclusion of the examination, law enforcement personnel determine that particular files or file folders on the computer and storage media do not contain any data falling within scope of the warrant, they will not search or examine those files or folders further without authorization from the Court. Law enforcement personnel may continue to examine files or data falling within the purview of the warrant, as well as data within the operating system, file system, software application, etc. relating to tiles or data that fall within the scope of the warrant, through the conclusion of the case.

C. If the computer and storage media does not contain any data falling within the ambit of the warrant, the government will return the computer and storage media to its owner within a reasonable period of time following the search and will seal any image of the digital evidence absent further authorization from the Court.

"

"

"

"

Page 8 – Affidavit of Jason Nix

D.  The government will retain a forensic image of the computer and storage media for a number of reasons, including proving the authenticity of evidence to be used at trial, responding to questions regarding the corruption of data, establishing the chain of custody of data, refuting claims of fabricating, tampering, or destroying data, and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.